# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

MAESHON WITHERSPOON      *

    Plaintiff,      *

    v.      *      Civil Action No. 8:18-cv-03421-PX

MEGAN J. BRENNAN,      *

    Defendant.      *

    ***

## MEMORANDUM OPINION

Pending in this employment discrimination case is Defendant Postmaster General Megan Brennan's motion to dismiss, or alternatively, for summary judgment. ECF No. 12.[1] The motion is fully briefed, and no hearing is necessary. Loc. R. 105.6. For the reasons that follow, the motion, construed as one for summary judgment, is granted in part and denied in part.

## I. Background

The following facts are undisputed. Plaintiff Maeshon Witherspoon (Witherspoon) is an African American, homosexual woman who started working for the United States Postal Service in 2015 as a Rural Carrier Associate at the Nottingham Branch. ECF No. 15-1 at 59; ECF No. 21-2 at 1. Her direct supervisor at the time was James Diggs, a white male. *Id.*; ECF No. 15 at 68; ECF No. 12-3 at 63:15–19. Lorraine Fonseca was Witherspoon's second tier supervisor and Diggs' direct supervisor. ECF No. 12-4 at 113:3–10. Then Postmaster, Gary Vaccarella, oversaw 43 post offices in the Baltimore City and County area, including Nottingham. ECF No. 12-4 at 8:10–10:8.

Postal carriers have historically experienced problems with mail trucks rolling away

---

[1] The claims proceed only against "the head of the department, agency or unit," of the agency being sued. 42 U.S.C. § 2000e-16(c). Accordingly, Defendants United States Postal Service and the United States of America are dismissed from this action. The Clerk shall amend the docket accordingly.

while their carriers deliver mail.  ECF No. 12-5 at 82:2–10; ECF No. 12-7 at 125:12–126:9.  Known as "rollaways and runaways," trucks moving independently of their drivers present obvious dangers.  In 2014 and 2015, several postal carriers were guilty of leaving their trucks running while the carriers were not in the vehicles.  ECF No. 15-1 at 62.

In winter of 2014 at the Nottingham branch, Diggs observed one such carrier, Cynthia Imbraguglio, a white woman, who left her truck running while she was not in the driver seat.  ECF No. 12-3 at 14:8–15:11; ECF No. 15 at 30; ECF No. 15-1 at 35, 61–62.  Diggs warned Imbraguglio not to do it again and otherwise allowed her to go about her business.  Imbraguglio was not disciplined in any way.  ECF No. 12-3 at 14:8–15:11.

Witherspoon did not experience similar leniency.  On December 3, 2015, Witherspoon and another African American carrier, Tyrell Jones, were removed from their positions for leaving their postal trucks running and unattended.  ECF No. 12-5 at 106:8–107:14.  It was a cold morning, so Witherspoon left her postal truck running with the keys in the ignition to defrost the windows while she packed the back of the truck.  *Id.* at 102:19–103:15.  Jones similarly was allowing his vehicle to warm while he was inside the Nottingham branch office.  ECF No. 12-4 at 64:8–20.

On that same morning, Vaccarella was visiting Nottingham branch unannounced.  ECF No. 12-3 at 13:7–16.  He saw Witherspoon at the back of the vehicle and noticed the truck was running.  ECF No. 12-4 at 25:15–26:2, 29:18–30:9.  He approached the truck, turned off the engine and removed the keys.  *Id.* at 30:9–10.  Vaccarella asked Witherspoon why she left the engine running and whether she knew about the policy against doing so.  ECF No. 12-4 at 30:12–18. Witherspoon responded that she was unaware of the policy but also that she did not

view her conduct as problematic because she was in the back loading her parcels.[2] ECF No. 12-5 at 104:16–105:11. Vaccarella issued an emergency placement immediately for both Jones and Witherspoon which resulted in immediate suspension from work without pay. ECF No. 12-4 at 52:10–19; ECF No. 15-1 at 71–72, 98–99.

On December 8, 2015, Witherspoon initiated EEO action, contending that she had been subject to "disparate treatment" when she was put on emergency placement. ECF No. 15 at 15, 34. After "pre-complaint counseling" reached no resolution, Witherspoon received a notice that she was now entitled to file a formal EEO complaint. *Id.* at 34.

Meanwhile, on January 5, 2016, Witherspoon was issued a formal Notice of Removal for leaving her vehicle unattended, ECF No. 15-1 at 74–76, as was Jones, *id.* at 103–05. Although this formal termination began with the incident Vaccarella had witnessed and his putting Witherspoon on emergency placement status, Vaccarella testified that it was Diggs who ultimately approved the final termination. ECF No. 12-4 at 63:4–64:3. Diggs now claims, however, that he would have preferred to counsel Witherspoon instead of firing her, but he "had to" approve her termination at the direction of, and on threat of reprisal from, Fonseca and Vaccarella. ECF No. 12-3 at 21:15–23:11, 63:13–64:15. In fact, Diggs contends that he viewed Witherspoon's termination as a "bad business decision" because she performed well, and her removal came during the height of the holiday delivery season. *Id.* at 24:5–21, 25:14–17. Fonseca contradicts both Vacarella and Diggs, claiming that it was she who "made the decision ultimately" to terminate Witherspoon. ECF No. 12-7 at 51:6–17.

The parties also disagree vigorously on the relevant policies in place regarding rollaway

---

[2] Witherspoon and Vaccarella disagree about whether Witherspoon actually left the vehicle as it was running. Witherspoon contends she was inside of the vehicle towards the back, ECF No. 12-5 at 103:12–105:6, whereas Vaccarella says he saw Witherspoon outside the vehicle, ECF No. 12-4 at 27:4–9, 29:19–30:8.

and runaway vehicles. Defendant maintains that in late 2015, the Post Office issued a formal initiative to prevent rollaways and runaways, and that they consistently terminated employees who violated this policy. ECF No. 12-1 at 3; *see* ECF No. 12-4 at 44–52:15, 57:13–61:9 (Vaccarella testifying that he recommended removal for three employees, including Witherspoon, for leaving vehicles unattended with engine running). Defendant further maintains that routine safety talks apprised all postal employees of this new initiative. ECF No. 12-4 at 65:20–67:2; ECF No. 15 at 93; ECF No. 15-1 at 31.

Witherspoon, however, testified to the contrary. She denies that she was told to keep her keys with her at all times, denies familiarity with notices about rollaways supposedly posted at the Nottingham office, ECF No. 12-5 at 82:14–83:21, and maintains that it "entirely possible" that, as a substitute carrier, she was not present when any safety talks would have taken place, ECF No. 22 at 17, 23. Accordingly, if such initiatives were in place, she was none the wiser.

The supervisors also disagree among themselves as to whether such formal policies as to runaways and rollaways were in fact implemented. Although Vaccarella testified that Witherspoon and Jones had been terminated for committing an "egregious safety violation," ECF No. 12-4 at 36:3, he also professed not to know about any formal "initiative" in 2015. ECF No. 12-4 at 76:6–15. Fonseca testified similarly. ECF No. 12-7 at 82:8–11 (Fonseca "d[idn't] know that [they] had a specific rollaway initiative").

Shortly after her emergency placement, Witherspoon filed a formal grievance established through their collective bargaining agreement. ECF No. 12-5 at 106:1–5, 115:9–12. On June 2016, Witherspoon settled her grievance. ECF No. 12-6; ECF No. 12-5 at 115:13–116:7. As part of her settlement agreement (a two-paragraph letter), she was reinstated without back pay and received a lump sum payment of $3,458. The agreement is memorialized as follows:

4

> [I]t was mutually agreed to resolve the above captioned grievance in accordance with the following:
>
> The grievant will be returned to work without back pay as soon as administratively possible. The discipline will be recorded as a 14-day suspension . . . expunged from the record one year from the date of issuance provided, there is no subsequent discipline is [sic] issued. The grievant will be compensated a lump sum payment of $3458.00 less normal deductions.
>
> The parties agree that this full and final settlement is made without prejudice to the position of either party. It is not precedent setting and will not be cited by either party in any subsequent Grievance/Arbitration hearing, or in any other form.

ECF No. 12-6.

When she returned to work, Witherspoon was assigned fewer scheduled work hours, resulting in a significant pay decrease. ECF No. 21-2 at 3–4. Witherspoon also contends that Fonseca treated her adversely upon Witherspoon's return, although the record provides few examples of such adverse treatment. *Id.* at 4–5.

On March 18, 2016, Witherspoon filed a formal EEO Complaint, alleging discrimination on account of her race and sexual orientation. *Id.* at 43. The parties engaged in discovery during the administrative process. *See generally* ECF No. 15.[3] Then, on June 13, 2018, Witherspoon filed suit in this Court, alleging race discrimination in violation of Title VII (Count 1), sexual orientation discrimination in violation of Title VII (Count 2), retaliation on account of protected EEO activity (Count 3), and companion state statutory and common law claims (Counts 4 through 6). ECF No. 1-3. Defendant now challenges the sufficiency of all claims on several grounds. ECF No. 12.

For the reasons discussed below, the Court denies Defendant's motion as to Count 1,

---

[3] The record is unclear as to how the EEO process was finally resolved. *See* ECF No. 15. However, the parties do not dispute that Witherspoon maintains the right to pursue her claims in this Court.

denies the motion as to the retaliation claim and grants the motion as to the hostile work environment claim (all in Count 3), and grants the motion as to all other counts.

II. **Standard of Review**

Defendant moves for dismissal or, in the alternative, for summary judgment. ECF No. 12. The parties have submitted evidence outside the four corners of the Complaint, have been given reasonable opportunity to present all pertinent material, and have both agreed that the motion should be treated as one for summary judgment. Thus, the Court reviews the motion under the summary judgment standard. *See* Fed. R. Civ. P. 12(d).

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

**III. Analysis**

Witherspoon brings several claims that may be addressed summarily without reference to the record evidence. The Court treats such claims first, then turns to those claims which require evaluation of the record.

**A. State Statutory and Common Law Claims Arising from Witherspoon's Termination (Counts 4–6)**

Witherspoon's companion state claims must be dismissed because Title VII affords her the exclusive remedy for discrimination-based causes of action against the federal government. *See* 42 U.S.C. § 2000e–16; *see also White v. Coates,* No. CIV. Y-99-2248, 1999 WL 1489198, at *2 (D. Md. Dec. 16, 1999). It is undisputed that Witherspoon's state claims are based exclusively on her alleged disparate discipline and termination arising from the December 3, 2015 incident. Thus, because Title VII provides the exclusive remedy for discrimination claims against the federal government, the state claims against the Defendant are barred here.

Witherspoon's allegations brought under the Maryland Fair Employment Practices Act (MFEPA) also appear to be time-barred. MFEPA claims must be brought within two years from the date of adverse action. *See* Md. Code Ann., State Gov't § 20-1013(a)(3). Witherspoon was put on emergency placement in December 2015 and fired in January 2016, but did not file suit until June 11, 2018. Thus, to the extent Witherspoon's claim arises from her alleged wrongful termination, the MFEPA claims are dismissed on this alternative basis. In any event, Defendant's requested relief is granted as to Counts 4 through 6.

**B. Discrimination Claims (Counts 1 and 2)**

Title VII provides that it is unlawful "for an employer . . . to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, where a plaintiff marshals no direct evidence of discrimination, the Court evaluates the claims using the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stoyanov v. Mabus*, 126 F. Supp. 3d 531, 541 (D. Md. 2015). With regard to alleged discriminatory discipline, a plaintiff first must establish a prima facie case of discrimination by demonstrating that (1) she is a member of a protected group; (2) the prohibited conduct in which she engaged was comparable in seriousness to the misconduct of employees outside the protected group; and (3) the disciplinary measures enforced against her were more severe that those enforced against other employees. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *Barnes v. ISG Sparrows Point, LLC*, No. BPG-10-2492, 2011 WL 4596058, at *7 (D. Md. Sept. 30, 2011). With regard to the prima facie case for discriminatory termination, a plaintiff must show "that (1) she is a member of a protected group; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

If Witherspoon establishes her prima facie case, the burden shifts to the Defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *See Langerman v. Thompson*, 155 F. Supp. 2d 490, 496 (D. Md. 2001). If the Defendant provides such a reason, the burden then shifts back to Witherspoon to raise a genuine dispute as to whether the proffered reason was pretextual. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d

846, 852 (4th Cir. 2001); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). Although the framework "involves a shifting back and forth of the evidentiary burden," Witherspoon "at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of" the law. *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 841 (D. Md. 2004); *see also Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008). "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the employer's action (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal alterations omitted)).

Where a plaintiff's theory of discrimination is by comparison to employees from a non-protected class, the plaintiff "must demonstrate that the comparator was 'similarly situated' in all relevant respects." *Johnson v. Balt. City Police Dep't,* No. ELH-12-2519, 2014 WL 1281602, at *19 (D. Md. Mar. 27, 2014) (quoting *Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014)); *see Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). This is not to say that comparators must be precisely equivalent to the plaintiff, but sufficient similarity must exist to allow appropriate comparison. *See Roberts v. Coffey*, No. DKC 10-3359, 2012 WL 2000353, at *4 n.11 (D. Md. June 4, 2012); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) ("[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel."), *aff'd*, 553 U.S. 442 (2008).

1. **Race Discrimination (Count 1)**

The Court begins with Witherspoon's race discrimination claim. Witherspoon contends that she was terminated on account of her race while other similarly situated carriers did not suffer the same fate. When viewing the record most favorably to Witherspoon, the claim survives challenge.

Clearly the parties dispute whether Witherspoon and her African American colleague, Jones, were terminated on account of their race, or as a result of implementing the safety "initiative" related to rollaway and runaway vehicles. The evidence points in both directions. On the one hand, according to another letter carrier at the Nottingham branch, it was "commonplace" for Caucasian carriers to leave their trucks unoccupied and running but not be fired. *See* ECF No. 15 at 30; ECF No. 15-1 at 61–62. Diggs also observed a Caucasian female carrier, Imbraguglio, engaged in the identical misconduct and gave her an informal warning rather than terminating her. Although Diggs professes that he "had to" to terminate Witherspoon, Vaccarella disagrees, and shifts the blame to Diggs as the ultimate decisionmaker in this respect. When viewing the record as a whole, a trier of fact must decide what the true motivation was for terminating Witherspoon—discriminatory animus based on Witherspoon's race or the legitimate non-discriminatory enforcement of a safety policy.

Defendant lodges several attacks on the claim. None are availing. First, Defendant argues that Witherspoon did not suffer adverse employment action because her "termination" was "rescinded" as a result of the settlement agreement obtained in the grievance process. The Court disagrees.

To be sure, and as the Defendant points out, when an employer remedies an initial adverse action with "final and corrective" measures, the adverse action itself "cannot be used as

evidence that discrimination existed." *Lurie v. Meserve*, 214 F. Supp. 2d 546, 550 (D. Md. 2002); *see also Dennis v. Cty. of Fairfax*, 55 F.3d 151, 153–54 (4th Cir.1995). Here, however, the "adverse action" was not remedied through the settlement. Plaintiff was certainly not made whole in that she suffered a loss of backpay. Thus, at a minimum, she could pursue the wrongful discharge or discipline claim for the period of months in which she was actually discharged.

Defendant's related argument that the terms of Witherspoon's reinstatement, as memorialized in her settlement agreement, bars the claim under the doctrine of accord and satisfaction also fails. Accord and satisfaction is an affirmative defense in which a defendant must prove (1) a bona fide dispute as to liability; (2) that the parties entered into an agreement regarding the dispute in which one party pays "a sum in excess of that which he admits he owes and the receipt by the other party of a sum less in amount than he claims is due him, all for the purpose of settling a dispute," (3) performance of the agreement. *Parker v. Prudential Ins. Co. of Am.,* 900 F.2d 772, 776 (4th Cir. 1990). Put simply, "[t]he accord is the agreement and the satisfaction is the execution or performance of such agreement," and "both elements must be present to "bar . . . the assertion of the original claim." *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 911 (D. Md. 2015) (citations and internal quotation marks omitted). As an affirmative defense, and on summary judgment, the Defendant bears the burden of demonstrating no genuine issues of fact exist as to the viability of accord and satisfaction.

The Defendant cannot make that showing. The settlement agreement makes plain that the scope of the agreement, even if fully performed, would not bar future claims in this Court. The agreement expressly states that *neither* party forfeits any claims or defenses going forward. Additionally, Witherspoon maintains that the agreement did not make her whole because it did not award her backpay for the several months she had been terminated. When viewing this

11

defense most favorably to Witherspoon, this affirmative defense does not bar the claim.

Defendant next maintains that no evidence shows Witherspoon was performing her job to her employer's satisfaction. On this, the current record cuts both ways. Diggs, as the direct supervisor, noted Witherspoon had performed her letter carrier duties well. Indeed, Witherspoon was reinstated to her position in June 2016. Although Defendant maintains that Witherspoon's "egregious safety violation" on December 3 renders her a sub-par employee as a matter of law, this argument begs the question of whether Witherspoon's termination was exacted for legitimate reasons or on account of Witherspoon's race. Because the evidence on this point is mixed, the Court denies Defendant's motion.

Defendant's final argument—that Witherspoon cannot show her position remained open or was filled by a member of a non-protected class—does not fit the facts of this case. The Fourth Circuit has recognized that the fourth element of a discriminatory termination claim does not always apply. When this prong does not shed any light on whether the employer treated the plaintiff adversely on account of discriminatory animus, the plaintiff is relieved of such burden. *See Miles v. Dell*, 429 F.3d 480, 488 (4th Cir. 2005). Because Witherspoon was reinstated, her claim does not fit neatly within the wrongful termination rubric. In this respect, Witherspoon's wrongful termination claim cleaves more closely to a disparate discipline claim in which she suffered a seven-month, temporary termination. However, even if the Court finds that the fourth prong is appropriate, sufficient evidence exists that the position was not filled. Diggs testified that terminating Witherspoon was a "bad business decision" because it left him shorthanded during a busy time of year. A fair inference, therefore, is that Witherspoon's position remained unfilled until she was reinstated. Defendant has produced no evidence to the contrary. Thus, Defendant's motion is denied on as to Count 1.

## 2. Sexual Orientation Discrimination (Count 2)

The Court next turns to Witherspoon's claim that she had been discriminated on account of her sexual orientation. Although it remains a live question whether Title VII reaches a sexual-orientation discrimination, *see Altitude Express, Inc. v. Zarda*, 139 S. Ct. 1599 (2019) (granting certiorari as to whether Title VII applies to sexual orientation discrimination), *Bostock v. Clayton Cty.*, 139 S. Ct. 1599 (2019) (same), the claim fails for a different reason.

When viewing the record most favorably to Witherspoon, no evidence suggests that any adverse action was taken against her on account of her sexual orientation. At this stage, the record is silent as to the sexual orientation of Witherspoon's sole comparator, Imbraguglio. It is further undisputed that Vaccarella had never met Witherspoon prior to December 3, 2015 and thus had no knowledge of her sexual orientation. *See* ECF No. 12-5 at 102:8–15, 107:18–108:2. Witherspoon also admits that she never discussed her sexual orientation with Fonseca. *Id.* at 116:12–15. Finally, as to Diggs, the only possible evidence suggesting Diggs even knew about Witherspoon's sexual orientation is that, according to Witherspoon, she and Diggs once talked about their families, to include "the wife and kids." *Id.* at 116:16–117:11. Diggs, for his part, testified that at the time he did not know Witherspoon's sexual orientation. ECF No. 12-3 at 153:20–154:4.) The Court will not permit this claim to proceed on such a thin reed.

Witherspoon provides no further details supporting when, how, or under what circumstances her conversation with Diggs took place. Nor can the Court discern whether Witherspoon communicated her sexual orientation to Diggs, even when the Court views Witherspoon's testimony on this matter in the light most favorable to her. Accordingly, the claim fails on the current record.

The Court is mindful that even though the administrative record is robust, the parties may

seek additional discovery. To the extent the Plaintiff obtains, through targeted discovery, evidence that would substantiate this claim—and if the claim is not ultimately foreclosed by the United States Supreme Court—this Court will entertain a request to Amend the Complaint to include this allegation. That said, and because Plaintiff has already raised several flatly barred claims, the kitchen sink approach going forward is ill advised.

### C. Retaliation and Hostile Work Environment Claims (Count 3)

In Count 3, Witherspoon combines two discrete theories of liability – retaliation and hostile work environment discrimination—into one Count. The Court addresses each theory separately.

#### 1. Retaliation

To make out a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) the employer took an adverse action against her; and (3) a causal link exists between the two. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). A retaliation claim is governed by the same burden-shifting framework as the discrimination claim. *Id.* at 327. If a plaintiff makes a *prima facie* retaliation claim, the burden then shifts to the defendant "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* at 328 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). The plaintiff must then rebut the defendant's evidence by demonstrating the purported reason was pretextual. *Id.* at 328.

As evidence of retaliation, Witherspoon points primarily to the significantly reduced shift hours assigned to her when she returned to work in 2016. Witherspoon maintains that between June and November 2016, she experienced a reduction of over 200 hours as compared to the comparable period previously worked. ECF No. 22 at 23–25. Defendants respond that

Witherspoon in fact experienced an increase of hours as to her primary and secondary routes, and that her reduced hours were "auxiliary assistance hours" to which she "was not guaranteed." ECF No. 27 at 2, 16. The record as to what type of hours Witherspoon had been denied is inscrutable. *See generally* ECF No. 12-3 at 37:16–59:7. That said, Defendants legal contention that Witherspoon may not maintain a Title VII claim based on lost discretionary hours is flatly contradicted by precedent. *Ray v. Int'l Paper Co.*, 909 F.3d 661, 667–68 (4th Cir. 2018) (reduction in availability of voluntary overtime hours may constitute adverse employment action because it reduces take home pay).

Further, Diggs *admitted* that he reduced Witherspoon's hours, albeit as part of an across-the-board cut for all carriers who had previously clocked significant overtime. ECF No.12-3 at 33:5–35:16. Yet, apart from Diggs' assertion, no record evidence supports that Witherspoon's reduced hours were the result of a system-wide cut in overtime. At this stage, the Court cannot find that summary judgment is appropriate. Genuine issues of fact exist as to whether Witherspoon's hours were reduced as part of an across-the board cut or whether this proffered reason is pretextual. Summary judgment on the retaliation claim is therefore denied.[4]

2. **Hostile Work Environment**

To succeed on a Title VII hostile work environment claim, a plaintiff must establish that she experienced (1) unwelcome conduct, (2) on account of her race, (3) that was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment, and (4) the conduct is imputable to the employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001). "[H]arassment need not be accompanied by a

---

[4] The Court is mindful that the parties have already engaged in robust discovery and so will not permit duplication of efforts going forward. Accordingly, the parties should be prepared to discuss at the first scheduled status conference what, if any, remaining outstanding discovery is needed as to this claim.

contemporaneous statement of animus to be actionable under Title VII—rather, the connection between animus and conduct may be inferred from the totality of the circumstances." *Strothers*, 895 F.3d at 330–31. Courts must apply "common sense" and "appropriate sensitivity to social context" to the "constellation of surrounding circumstances" to determine whether a plaintiff was subject to unwelcome conduct based on race. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

In assessing the sufficiency of this claim, the Court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 299 (4th Cir. 2015). This prong is met "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.* at 298 (citation omitted). In contrast, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (citation omitted).

To support her hostile work environment claim, Witherspoon identifies her losing shift hours and Fonseca's "falsely" accusing Witherspoon of on-the-job car accidents. ECF No. 22 at 23, 28; *see* ECF No. 12-5 at 94:17–96:9. Witherspoon also notes one incident where Fonseca raised her voice at Witherspoon during a dispute about sorting the mail. ECF No. 21-2 at 5–6 (Fonseca told Witherspoon to "get off her floor and take the mail out."). Viewing the record most favorably for Witherspoon, this claim must fail. This is so because the events, taken together, simply do not create an abusive or hostile environment such that Witherspoon's

working conditions were materially altered.

Mere decline in work hours alone does not connote an abusive environment, nor does addressing Witherspoon's car accidents. To be sure, reduction in work hours, if true, constitutes adverse employment action, which is precisely why Witherspoon's other liability theories survive challenge. However, such reduction does not also support that Witherspoon experienced such an abusive and racially hostile environment as to alter her working conditions.

As to Witherspoon's work-related accidents, she does not deny that they occurred. ECF No. 12-5 at 97:1–98:13. And although Witherspoon maintains that she is unfamiliar with the Post Office's accident safety review program for all carriers with fewer than two-years' experience, *id.* at 101:5–8, she also does not deny the program exists. Fonseca further confirms that her review of Witherspoon's accidents was indeed because Witherspoon was in the program as a newer employee. ECF No. 12-7 at 98:8–100:8. But more to the point, the mere review of Witherspoon's accidents does not support a hostile work environment claim.

Finally, Witherspoon's characterization of Fonseca as "hostile," even in combination with the other record evidence, does not alter this analysis. "Title VII does not establish a 'general civility code for the American workplace'" and "[s]ome rolling with the punches is a fact of workplace life." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Oncale v. Sundowner Offshore Servs., Inc.* 523 U.S. 75, 80 (1998)); *Cf. Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (no hostile work environment despite one occasion when supervisor "yelled at Plaintiff, told her she was incompetent, pushed her down in her chair, and blocked the door to prevent Plaintiff from leaving while he continued to yell at her"). A single isolated incident of harsh words exchanged during a work-related argument, alone or in combination with the other record evidence, does not support that Witherspoon

suffered a workplace permeated with discriminatory intimidation, ridicule or insult. Accordingly, the claim fails. Summary judgment is granted on this liability theory.

## IV. Conclusion

Based on the forgoing, Defendant's Motion for Summary Judgment is DENIED as to the race discrimination claim (Count 1); GRANTED as to the sexual-orientation discrimination claim (Count 2); DENIED as to the retaliation claim (Count 3), GRANTED as to the hostile work environment claim (Count 3); and GRANTED as to the state statutory and common law claims (Counts 4-6). A separate Order follows.

| | |
|---|---|
|     3/26/2020 |     /S/ |
| Date | Paula Xinis |
| | United States District Judge |